IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: ) | | Bankruptcy 21-21306-CMB |
| Sumanta Banerjee, ) | | |
| ) | | (Chapter 7) |
| Debtor in Possession. ) | | |

---

| | | |
|---|---|---|
| Sadis & Goldberg, LLP ) | | Adversary No. _____ |
| Plaintiff, ) | | |
| v. ) | | **ELECTRONICALLY FILED** |
| Sumanta Banerjee, ) | | |
| Defendant. ) | | |

---

## COMPLAINT OBJECTING TO DISCHARGE AND TO OBTAIN A DETERMINATION OF DISCHARGEABILITY OF DEBT

Sadis & Goldberg, LLP ("Sadis"), by and through its attorneys, for its Complaint objecting to the discharge of a particular debt owed to Sadis by Sumanta Banerjee ("Mr. Banerjee" or "Debtor") because the debt is for money obtained by actual fraud and Mr. Banerjee made various misrepresentations in his petition and under oath and for a determination that assets not disclosed in Mr. Banerjee's petition are not protected by any discharge, and related relief, states as follows:

1. This Court has jurisdiction over this case under 28 U.S.C. §1334(b) and §157(b)(1) and 11 U.S.C. §§ 523 and 727; this adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(2).

2. Venue for this adversary proceeding is appropriate in this Court because the Mr. Banerjees' bankruptcy case is pending before this Court pursuant to 28 U.S.C. §1409.

3. On June 1, 2021, Mr. Banerjee first filed his Voluntary Petition for Bankruptcy.

{00445603.DOCX; 1}

4. On July 2, 2021, Mr. Banerjee filed his full sworn Petition for Bankruptcy including Official Forms 106, 107, 108, and 122 (the "Petition").

5. On November 24, 2021, Sadis filed Form 410, its Proof of Claim for the amount of $577,678.95, including the Judgment amount of $539,956 and interest of $37,722.95. Sadis is a "creditor" within the meaning of 11 U.S.C. §101(10)(A).

6. After numerous extensions, to allow for the production of documents and Mr. Banerjee's 2004 examination, Sadis now brings this adversary proceeding to object to the discharge of Mr. Banerjee's debt to Sadis and, at the very least, to seek a ruling that foreign assets that Mr. Banerjee regularly accesses or receives in the United States—but did not declare in his Petition—are not protected by any discharge and can still be collected on by Sadis.

I. **SADIS PROVIDES $379,652 IN LEGAL SERVICES TO BANERJEE BUT HE REFUSES TO PAY**

7. Plaintiff Sadis is a law firm and Limited Liability Partnership organized under Delaware law, authorized to do business in the state of New York, and whose principal place of business is 551 5th Avenue, 21st Floor, New York, New York 10176.

8. Defendant Debtor, Mr. Banerjee, is a citizen of Pennsylvania, with a residence of 1514 Cook School Rd., Pittsburgh, PA 15241.

9. In March 2008, Mr. Banerjee engaged Sadis to represent him in a lawsuit filed against Mr. Banerjee by his former employer, Tuckerbrook Alternative Investments, LP ("Tuckerbrook").

10. Sadis provided legal services to Mr. Banerjee from March 2008 until June 2009, during which time Mr. Banerjee accumulated unpaid legal fees of $379,652.37.

11. After various attempts to collect the unpaid balance, on October 18, 2013, Sadis filed a summons and complaint against Mr. Banerjee in the Southern District of New York

("SDNY") under Docket Number 13-cv-7355. Sadis later re-filed the action under Docket Number 14-cv-00913 on February 13, 2014 (the "SDNY Action"). The SDNY Action sought to collect the $379,652.37 owed, plus contractual interest at a rate of 1% a month (the "Original Debt").

12. On February 6, 2015 the SDNY granted Sadis' motion for a default judgment and a judgment of $383,448.90 was entered on April 28, 2015.

13. A year later, on April 27, 2016, Banerjee filed a motion to set aside the default judgment. Banerjee argued that he lived in India and was not properly served under the Hague Service Convention and had a meritorious defense. In support of his motion, Banerjee represented to the SDNY that he did not have any property in the United States, did not earn any income in the United States, and did not pay any State or local taxes.

14. The SDNY denied Mr. Banerjee's motion finding that he had been properly serviced and did not have a meritorious defense. Mr. Banerjee appealed to the United States Court of Appeals for the Second Circuit. On appeal, Mr. Banerjee advanced a new argument, claiming that he was a U.S. citizen domiciled in India in February of 2014 and therefore outside of the SDNY's subject matter jurisdiction.

15. On March 22, 2018, the Second Circuit upheld the service on Mr. Banerjee and the validity of the default judgment, if there was subject matter jurisdiction. But the Second Circuit remanded to the district court to determine whether Mr. Banerjee was domiciled in Pennsylvania or India at the time the second Complaint was filed on February 13, 2014. The matter of Banerjee's domicile in 2014 in the SDNY Action is currently stayed pending the outcome of this proceeding.

II. **SADIS DISCOVERS THE BANERJEES' FRAUDULENT TRANSFERS**

16. In various filings in the SDNY Action, Mr. Banerjee claimed to not have had any income in the United States in 2013 and 2014. But in 2019, through discovery related to the issue

of Mr. Banerjee's domicile, Sadis discovered that, contrary to Mr. Banerjee's representations before the SDNY, the State of Pennsylvania's Department of Revenue believed that Mr. Banerjee had earned $431,610 in 2014 and $108,346 in 2013 and had filed a tax lien for the income taxes that Mr. Banerjee should have paid on that money.

17. On February 14, 2019, Sadis took Sumanta Banerjee's deposition. At his deposition, Mr. Banerjee testified that the $431,610 was money he earned from the sale of stocks and bonds in a fund called Common Fund Distressed Partners II. Ex. A at 269:2–8. Mr. Banerjee similarly testified that $108,346 in 2013 was money he earned from the sale of stocks and bonds in a fund called Common Fund Distressed Partners I in 2013. *Id.* at 262:21–263:16.

18. Mr. Banerjee further testified that the $431,610 was sent to him as a check in 2014 and he endorsed the check over to his wife, Akshita Banerjee ("Mrs. Banerjee"). *Id.* at 269:9–270:4. And Mrs. Banerjee similarly testified that Mr. Banerjee endorsed the $108,346 check over to her in 2013. Ex. B at 86:20–24. Mr. Banerjee received no consideration from his wife for these transfers. These transfers from Mr. Banerjee to his wife, occurring well after Mr. Banerjee was a debtor to Sadis, were fraudulent transfers under New York and Pennsylvania law.

### III. SADIS OBTAINS A JUDGMENT FOR FRAUDULENT TRANSFER AGAINST THE BANERJEES IN THE WDPA

19. On December 31, 2019, Sadis filed an action in the United States District Court for the Western District of Pennsylvania seeking recovery of the fraudulently transferred $431,610 and $108,346 against both Mr. and Mrs. Banerjee (together the "Banerjees") under Pennsylvania and New York law at Civil Action No. 2:19-CV-01682 (the "WDPA Action").

20. The Banerjees failed to respond to the complaint, and, on February 20, 2020, Sadis obtained a judgment against the Banerjees for $539,956.00 plus costs (the "Judgment").

21. On July 15, 2020, the Banerjees filed a Motion to Set Aside the Default claiming that they had never been served and were unaware of the WDPA Action until June 15, 2020. But the Banerjees claim that they were never served was false.

22. In addition to affidavits of service from the neutral process server showing personal service on Mrs. Banerjee on January 10, 2020, Mrs. Banerjee had left a voicemail for Sadis' counsel on January 31, 2020 requesting an extension to answer the WDPA Action Complaint—neatly demonstrating that she was fully aware of the WDPA Action.

23. On July 28, 2020, in a Memorandum denying Defendants' Motion to Set Aside the Default Judgment, Judge Schwab found that the Banerjees failed to allege any meritorious defenses and highlighted "a pattern of tactics evidencing culpability of Defendants" and efforts to "shift assets in an attempt to become judgment proof." *See* July 28, 2020 Memorandum Order Denying Motion to Set Aside Default Judgment, a copy of which is attached hereto as Exhibit C, at 7-9.

24. Despite the Judgment against them in the WDPA Action and the District Court's denial of their Motion to Set Aside the Default, Mr. and Mrs. Banerjee refused to pay their debt.

25. Because the Judgment is for an intentional fraudulent conveyance—"actual fraud" under 11 U.S.C. § 523(a)(2)(A), it is not dischargeable in bankruptcy as a matter of law.

### IV. SADIS DISCOVERS THAT THE BANERJEES FORMED THE SASB TRUST AND TRANSFERRED ASSETS INTO THE TRUST

26. During discovery in the SDNY Action Sadis discovered that in or around May 2014, Mrs. Banerjee formed SSA Capital Advisors, LLC ("SSA Capital"), a Delaware limited liability company. SSA Capital is a management company that Mr. and Mrs. Banerjee operated together managing various real estate investment businesses.

27. On March 30, 2015, the Banerjees—together with a group of private investors—created SSA Capital Partners I, LLC which operated at least one mobile home park. The SASB Trust was an investor in SSA Capital Partners I and the Banerjees managed numerous subsequent entities, including SSA Capital Partners II; SSA Capital Partners III GP, LLC; SSA Capital Partners IV, LLC; SSA Family Fund, LLC; SSA Capital Partners III Five Parks, L.P.; and SSA POH, LLC; among many others.

28. SSA Capital was also an investor in SSA Capital Partners I. In addition SSA Capital was the management company for all of the various funds and earned management fees from them.

29. In 2019 Sadis also discovered the existence of a trust, known as the SASB Trust, in the United States that was controlled by the Banerjees.

30. On January 8, 2021, in an effort to enforce the Judgment and collect on the debt, Sadis filed a motion in the WDPA Action to impose a constructive trust on money flowing from SSA Capital to the Banerjees or to the SASB Trust for the benefit of the Banerjees (the "Enforcement Motion").

31. In response to this motion and subsequent related filings the Banerjees revealed that they had formally formed the SASB Trust as The SASB Irrevocable Trust Dated June 14th, 2014 in June 2014, after Sadis filed the SDNY Action against Mr. Banerjee, naming Anant Gandhi ("Gandhi"), Mrs. Banerjee's father, as the Trustee.

32. The formation of the SASB Trust in June 2014 occurred well after Mr. Banerjee became a debtor to Sadis and well after Mrs. Banerjee knew that Mr. Banerjee owed money to Sadis because she accepted service of the original Complaint in the SDNY Action in November of 2013.

33. Any transfer of Mr. Banerjee's assets into the SASB Trust occurring after its formation was made for the purpose of hiding his assets from creditors and is a fraudulent transfer—including the transfer of any portion of the $539,956 that Mr. Banerjee earned in 2013 and 2014. Indeed, Mr. Banerjee testified that one of the reasons he and his wife created the SASB Trust was to hold some of the $539,956 for the benefit of their children. Ex. G at 137:12-24.

34. Mr. Banerjee's creation of the SASB Trust and his role of Grantor to the Trust contradict his claim in the Section 341 Meeting (at 4:59) that none of his assets had been placed in a trust fund.

35. On February 9, 2021, the Honorable Judge Schwab granted the Enforcement Motion and ordered a constructive trust "upon any and all payments" made from SSA Capital to the Banerjees or to the SASB Trust for the benefit of the Banerjees (the "Enforcement Order"). A copy of the Enforcement Order is attached hereto as Exhibit D.

36. In the Enforcement Order, Judge Schwab wrote "[b]ecause this Court has found that Defendants have engaged in a 'pattern of willful defaults and fraudulent transfer of assets ... engaging in this purposeful course of evasion of its secured creditors' and 'continue(s) to improperly shift assets to avoid judgments' the imposition of a constructive trust on Defendants' interests in SSA Capital and the SASB Trust is within this Court's equitable powers and necessary to enforce this Court's Judgment." Ex. D at 4 (internal citation omitted).

V. **DESPITE THE WDPA COURT IMPOSING A CONSTRUCTIVE TRUST, THE BANERJEES CONTINUE TO REFUSE TO PAY AND THE SASB TRUST IGNORED THE COURT'S RULING**

37. On February 12, 2021, Sadis served a copy of the Enforcement Order on Gandhi as the Trustee of the SASB Trust. The letter attaching the Enforcement Order notified Gandhi that the Enforcement Order "imposed a constructive trust over any and all monies flowing to Sumanta Banerjee or Akshita Banerjee from SSA Capital … or the SASB Irrevocable Trust."

38. On February 23, 2021, counsel for SSA Capital and the SASB Trust responded claiming that the Enforcement Order "does not impose a constructive trust over any and all monies flowing to Sumanta or Akshita Banerjee from the SASB Trust" but only "payments made by SSA Capital to the SASB Trust for the benefit of Sumanta or Akshita Banerjee."

39. Additionally, counsel claimed that the Enforcement Order placed no restrictions on Gandhi's conduct in administering the SASB Trust because he was not a defendant in the WDPA Action and the SASB Trust was not under the WDPA's jurisdiction.

40. In late February of 2021, Plaintiff discovered that SSA Capital and the SASB Trust had accounts with Bank of America. Plaintiff sent a letter to Bank of America asking them to freeze any flow of money from those entities to either of the Banerjees. Plaintiff subsequently discovered that Akshita Banerjee also maintained an account with Bank of America and, on or about March 5, 2021, served a writ of execution on Bank of America.

41. However, Bank of America not only froze the accounts of SSA Capital, the SASB Trust, and Mrs. Banerjee but they also froze the accounts of every entity for which Mrs. Banerjee had the authority to withdraw money. This included SSA Capital Partners I, LLC and SSA Capital Partners III GP, LLC, SSA Family Fund, LLC and various other SSA entities (together the "SSA Entities").

42. On March 8, 2021, Steven Cherin, an attorney and investor with the Banerjees in SSA Capital Partners I, LLC and SSA Capital Partners III GP, LLC, sent a letter asking Bank of America to unfreeze accounts belonging to the SSA Entities.

43. On or about March 9, 2021, Bank of America unfroze the accounts of the SSA Entities but also unfroze the SASB Trust's account and Mrs. Banerjee's account. On information and belief, as soon as Mrs. Banerjee's account was unfrozen she immediately transferred the funds

in her account elsewhere or out of her name. By March 17, 2021 Mrs. Banerjees' Bank of America account was closed. The SASB Trust also closed its bank accounts both in the Bank of America and elsewhere in March of 2021, further attempting to hide them from collection.

44. On July 22, 2021, Sadis filed a new action against the SASB Trust, Gandhi, and Mrs. Banerjee seeking to recover the fraudulent transfer from Mrs. Banerjee to the SASB Trust and any subsequent transfer from the SASB Trust elsewhere.

45. On August 4, 2021, the Court entered a temporary restraining order enjoining the SASB Trust from further transferring or dissipating assets. But before a preliminary injunction hearing could take place, Mrs. Banerjee filed her original petition for bankruptcy and the WDPA stayed the new action.

## VI. MR. BANERJEE MADE FALSE STATEMENTS UNDER OATH IN HIS PETITION, 341 MEETING, AND 2004 EXAMINATION

46. In his Petition, Section 341 meeting, and Section 2004 Examination Mr. Banerjee made multiple false or misleading statements. Because Mr. Banerjee has knowingly and fraudulently "made a false oath or account" and "presented or used a false claim" his debt cannot be discharged under 11 U.S.C. §727(a)(4).

47. For example, in his Petition, Mr. Banerjee described his jewelry assets as a "Wedding band; watch" valued at $1,200. Ex. E at 4. But in prior filings in the SDNY Action, Mr. Banerjee filed a brief repeatedly citing an exhibit "6," a Separation Agreement, that Mr. Banerjee referred to as "legal and binding contract." SDNY Action, Dkt. No. 239 at 14-15. The Separation Agreement, attached hereto as Exhibit F, listed the value of the property that Mr. Banerjee was getting in the purported separation, including: two watches, a TAG and a Breitling valued at $10,000. Ex. F at 5.

48. An even more egregious example is Mr. Banerjee's statement in his Petition that he does not have any interests in "an LLC, partnership, and joint venture" and has no "Claims against third parties, whether or not you have filed a lawsuit." Ex. E at 5-6, ¶¶19, 33. In his 2004 Examination, however, Mr. Banerjee testified that he had a 50% interest in the GP of the Tuckerbrook SB Fund (the "Tuckerbrook Interest")—and "[t]hat interest still exists." Ex. G at 30:10-23. Mr. Banerjee's only justification for not listing the Tuckerbrook Interest on his Petition was that "it's sitting there in some limbo land." *Id*. at 31:23-32:3.

49. Mr. Banerjee also testified that he believed that investors in the Tuckerbrook SB Fund had successfully sued Tuckerbrook for Tuckerbrook's 50% interest for a settlement worth approximately $10 million. *Id.* at 34:23-35:17. Nevertheless Mr. Banerjee claimed that he never consulted with a lawyer about whether he had a legal right to his Tuckerbrook Interest and wanted to leave the money "to the investors for all their troubles." *Id*. at 32:12-19, 34:4-13. Thus, at the very least, Mr. Banerjee failed to include in his Petition a claim against non-parties that may be worth millions.

50. More egregious still is Mr. Banerjee's description of his total assets, leaving out the millions of dollars he effectively controls in India. In his Petition, Mr. Banerjee listed his total assets as $7,057.54. Ex. E at 6. And in his Section 341 Meeting testimony (at 7:23) he claimed not to have any assets outside of the United States. But in the Separation Agreement it stated that "Any and all assets in India will be owned by Sumanta Banerjee." Ex. F at 5. And both Mrs. Banerjee and Mr. Banerjee testified in the SDNY Action that these assets were substantial.

51. For example, Mrs. Banerjee testified in March 29, 2019 deposition: "So the Indian assets are his. I don't ask him. I don't know the total dollar. I know it's substantial." Ex. B at 128:5-9.

52. Similarly, Mr. Banerjee testified at a hearing in the SDNY Action on March 3, 2020: "Later on she impressed upon me that all of the assets in India were mine … so why wouldn't I give her the U.S. assets, which were a fraction of what was in India." Ex. H at 83:4-8.

53. Mr. Banerjee has claimed that the assets being referred to in this testimony is his family's Indian Trust, the Salil, Reba, Sassab Trust (the "Indian Trust"). Ex. H at 135:15-136:15. But this only highlights Mr. Banerjee's false claim in his Petition (Ex. E at 11) that the Indian Trust is a "creditor" of his. Rather, the Banerjees both clearly viewed the assets of the Indian Trust as Mr. Banerjee's assets because he could access them at will.

54. As Mr. Banerjee explained in his February 14, 2019 deposition in the SDNY Action, he contributed "millions" to the Indian Trust and his parents—Mr. Banerjee is an only child—contributed "multiples" of that because his family was "independently wealthy." Ex. A at 20:14-21, 21:16-20. Moreover, from 2011 onward, Mr. Banerjee testified that he "worked exclusively" for the Indian Trust (*id.* at 19:13-20) and received money from the trust "as I need it." *Id.* at 14:2-8.

55. At his SDNY deposition, Mr. Banerjee described the money he receives from the Indian Trust as "gifts" that he accesses through credit cards and debit cards that he holds but are in the name of the Indian Trust. *Id*. at 22:3-19. In addition, Mrs. Banerjee also had credit cards and a debit card that were in Mr. Banerjee's name that had access to accounts in India. *Id.* at 140:15-141:15, 230:8-18.

56. In his 2004 Examination, Mr. Banerjee testified that he still uses the Indian Trust credit card to take money from India and use it in the United States for "whatever [he] needed." Ex G at 54:5-18. For daily expenses under $250, Mr. Banerjee testified that he just swipes the

card but for larger expenses he asks his mother first. *Id.* at 112:2-22. A man that has access to whatever money he needs is not bankrupt.

57. At some point in time[1] Mr. Banerjee's mother executed a document stating that Mr. Banerjee was no longer a beneficiary of the Indian Trust but was an alternative Trustee. However, this "removal" of Mr. Banerjee as a beneficiary of the Indian Trust was just a formal move to protect the assets of the Indian Trust from Sadis' claims. Practically speaking, nothing changed about how Mr. Banerjee was supported by the Indian Trust and he continues to use the Indian Trust credit cards to pay for his daily expenses. *Id*. at 117:7-22, 63:12-64:16 (conceding that his "employment situation" and "income" has not changed "in the last 10 years").

58. It is clear, therefore, that Mr. Banerjee's claim in the Petition that the Indian Trust is creditor in the amount of $197,350 is false. Mr. Banerjee does not know how that amount was calculated, is unaware of any promissory note or loan documents, was never provided with a schedule showing how much he owes, the Indian Trust never asked him to pay back the money, and until 2020 Mr. Banerjee believed the money he was receiving was all gifts. *Id.* at 57:4-59:25. As such, the Indian Trust is not properly listed as a creditor on the Petition. On the contrary, the Indian Trust is a consistent source of income for Mr. Banerjee and has been since 2011.

59. Additionally, because Mr. Banerjee has not produced records sufficient to how the $197,350 was calculated or how much total money he has pulled out of the Indian Trust over the years, Mr. Banerjee's true financial condition cannot be ascertained. Therefore his debt cannot be discharged under 11 U.S.C. §727(a)(3).

---

[1] Although the letter is dated January 15, 2020, Mr. Banerjee concedes that he did not find out about it until sometime in the middle of 2020.

60. Indeed, even Mr. Banerjee concedes that he still has a matured insurance policy in India. Ex. G at 102:3-103:3.

61. At the very least, because Mr. Banerjee did not report the Indian Trust, other Indian assets, or other foreign income on his Petition, these assets are not being administered by the Court and they should be outside the scope of any payment plan or discharge awarded by this Court.

### VII. CONTRARY TO HIS PETITION, MR. BANERJEE WORKS FOR THE REAL ESTATED INVESTMENT FUNDS HE OPERATES WITH HIS WIFE

62. In his Petition Mr. Banerjee claimed to not be employed and have no income. Ex. E at 15. In reality, however, he has been working with his wife in her businesses for since at least 2016. Indeed, Mr. Banerjee does not collect unemployment or social security. Ex. G at 67:12-15.

63. Mr. Banerjee wrote in the SDNY Action, he "did serve as a senior advisor to SSA Capital Advisors after the Banerjees' reconciled in 2016." SDNY Action Dkt. No. 239 at 29. Upon information and belief, Mr. Banerjee has continued that role with Evergreen Parkes, LLC and the other Evergreen Entities created by Mrs. Banerjee. *See, e.g.*, Ex. G at 43:8-21 ("I'm … a senior advisor to whoever needs me, whether it's my wife or the [] investors that my wife has … or the trust in India.").

64. As Mr. Banerjee admitted in his Section 2004 Examination, his role with the SSA Entities and later the Evergreen Entities included, and still includes:

- "finding new acquisitions" and "vet[ting] them with my wife to see if they were good investments or not." Ex. G at 192:10-22;

- "talk[ing] to investors," including Benedict Realty Group, "a very sophisticated and very large real estate firm" that invested millions in the SSA Entities investment group. *Id.* at 190:2-191:19, 192:23-193:3;

- "coordinat[ing] with banks to finance deals." *Id.* at 200:6-13; and

- Doing "due diligence on potential deals," including "go[ing] down to the properties to look at them." *Id.* at 200:14-24.

65. Mr. Banerjee claims that he does all of this without getting paid. In reality, however, he does this work "to increase the amount of that ultimately ends up in [his] wife's pocket." *Id.* at 222:16-223:2. In reality, Mr. Banerjee was an equal partner with his wife in operating "a series of real estate businesses … under the umbrella **SSA Capital Advisors,** based in a suburb of Pittsburgh." Ex. I, December 1, 2021, Hedge Fund Alert at 6. SSA Capital and all of the SSA Entities were parts of Mrs. Banerjee's business together with her partners and investors.

66. This has continued even after both of the Banerjees filed for bankruptcy. As Mrs. Banerjee told a reporter in late 2021, she and her husband were "raising capital" for a "commercial real estate investment fund." *Id*.

67. On information and belief, Mr. Banerjee is at least equal with his wife in the creation and operation of the SSA Entities investment group and the Evergreen Entities investment group. Far from unemployed, Mr. Banerjee is a sophisticated investor, investment banker, and businessman running real estate funds in the United States and overseeing a real estate empire in India.

## COUNT I

## OBJECTION TO DISCHARGE OF THE JUDGMENT DEBT UNDER 11 U.S.C. § 523(a)(2) AND §1328(a)

68. Sadis restates and incorporates by reference each of the allegations stated above, as if fully stated herein.

69. Mr. Banerjee's Judgment debt to Sadis is as a result of an intentional fraudulent transfer which resulted in the Judgment. The Honorable Judge Schwab found that Mr. and Mrs. Banerjee "engaged in a pattern of willful defaults and fraudulent transfer of assets" which was part of "this purposeful course of evasion of its secured creditors."

70. Judge Schwab also found that Sadis was legitimately concerned that the Banerjees would "continue[] to improperly shift assets to avoid judgments." And indeed that is exactly what the Banerjees did. Faced with the Judgment against them, the Banerjees transferred their business, SSA Capital—including the equity that SSA Capital had in various SSA Entities and Evergreen Parkes—into the SASB Trust and, upon information and belief, falsely backdated the documents.

71. Therefore, Mr. Banerjee's debt to Sadis is not dischargeable under 11 U.S.C. § 523(a)(2)(A) as it is "for money … obtained by … actual fraud." *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 359 (2016) ("The term "actual fraud" in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation.").

## COUNT II

## OBJECTION TO DISCHARGE OF THE JUDGMENT DEBT UNDER 11 U.S.C. §727(a)(4)(A)&(B)

72. Sadis restates and incorporates by reference each of the allegations stated above, as if fully stated herein.

73. Mr. Banerjee's Petition was filed in bad faith and Mr. Banerjee is attempting to procure discharge of his debt to Sadis through false claims in his Petition, Section 341 Meeting, and Section 2004 Examination—all filed under oath.

74. Mr. Banerjee knowingly made the following false claims under oath: (a) claimed not to have transferred assets into a trust even though he had transferred assets into the SASB Trust; (b) falsely understated the value of his jewelry; (c) claimed not to have any interest in any partnership or LLC or any legal claim against non-parties despite his Tuckerbrook Interest still being out there an available to be claimed; (d) claimed to only have $7,057.54 worth of assets, and no foreign assets, despite have nearly unlimited access to the Indian Trust whenever he needed

money; and (e) claimed that the Indian Trust was a creditor and that the money he received from them was loan.

75. Additionally, Mr. Banerjee claimed to be unemployed despite working extensively for his wife's businesses and, upon information and belief, being equal to her in the creation and operation of those real estate investment businesses.

76. These misrepresentations in his Petition, 341 Meeting, and 2004 Examination are "a false oath or account" and "a false claim" under 11 U.S.C. §727(a)(4). As such, the Court should not grant Mr. Banerjee discharge of his debt.

## COUNT III

## OBJECTION TO DISCHARGE OF THE JUDGMENT DEBT UNDER 11 U.S.C. §727(a)(3)

77. Sadis restates and incorporates by reference each of the allegations stated above, as if fully stated herein.

78. Section 727(a)(3) of the Bankruptcy Code provides that a debtor's debt should not be discharged when "the debtor has … failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained."

79. Mr. Banerjee worked since 2011 managing the Indian Trust. Mr. Banerjee regularly received distributions from the Indian Trust for over 10 years and now claims that he owes the Indian Trust $197,350 but cannot show how that amount was calculated.

80. Thus Mr. Banerjee has failed to keep or preserve records of his primary source of income for the last decade and claims a debt to them that he cannot substantiate or even calculate how the amount of the debt was determined.

81. Because there is simply not enough information to ascertain the truth of Mr. Banerjee's financial condition, his Petition for Bankruptcy must be denied.

## COUNT IV

### REQUESTING THE COURT NOT DISCHARGE THE DEBT WITH RESPECT TO ASSETS THAT WERE NOT DISCLOSED ON THE PETITION, ARE NOT ADMINISTERED BY THE COURT, ARE NOT IN MR. BANERJEE'S PERSONAL NAME, OR ARE OUTSIDE THE UNITED STATES

82. Sadis restates and incorporates by reference each of the allegations stated above, as if fully stated herein.

83. Mr. Banerjee failed to include the Tuckerbrook Interest and the Indian Trust or other foreign assets in his Petition. At the very least, therefore, any discharge order must not include those assets.

84. Moreover, in the case of the Indian Trust assets, even payments or funds that Mr. Banerjee withdraws in the United States in the future must be excluded from discharge as they are not being administered Bankruptcy Court and are not part of the Bankruptcy Estate.

**WHEREFORE**, Sadis objects to any discharge of the Judgment and any plan that does not include a full and immediate repayment of the Judgment, and respectfully requests that this Honorable Court enter judgment declaring that pursuant to Section 523(a)(2)(A) and Sections 727(a)(3) & (4) of the Bankruptcy Code, Debtor's debt to Sadis in the total amount of $539,956—plus interest accruing at a rate of 6% per year since February 20, 2020—is not dischargeable in this or any future bankruptcy case filed by Debtor, and awarding Sadis its attorneys' fees and costs incurred in bringing this action, and grant any such further relief as this Court deems just and proper.

In the alternative, to the extent this Honorable Court does discharge any debt, Sadis respectfully requests that any Discharge Order specifically provide that assets not included in

Debtor's Petition, were not administered by this Court, are being held in the name of someone else or some other entity, or are outside the United States are excluded from discharge.

|  |  |
|---|---|
| Dated: January 31, 2023 | */s/ Ben Hutman*<br>By: Ben Hutman (admitted pro hac vice in Main Case, and application for pro hac vice admission pending for this adversary proceeding)<br>Sadis & Goldberg, LLP<br>551 Fifth Avenue, 21st Floor<br>New York, New York 10176<br>Telephone: (212) 947-3793<br>Email: bhutman@sadis.com<br><br>*/s/ Gary M. Sanderson*<br>Meyer, Unkovic & Scott LLP<br>Gary M. Sanderson, Esquire<br>Pa. I.D. #313591<br>gms@muslaw.com<br>535 Smithfield Street, Suite 1300<br>Pittsburgh, Pennsylvania 15222-2315<br>TEL: (412) 456-2800<br><br>Attorneys for Creditor Sadis & Goldberg, LLP |

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 31st day of January, 2023, I electronically filed and served the foregoing COMPLAINT OBJECTING TO DISCHARGE AND TO OBTAIN A DETERMINATION OF DISCHARGEABILITY OF DEBT using the CM/ECF system, which shall provide notice to all parties and counsel of record electronically, and a courtesy copy has been further served by U.S. Mail on counsel for the Debtor/Defendant and the United States Trustee, as follows:

John Lacher, Esquire
The Lynch Law Group
501 Smith Drive, Suite 3
Cranberry Twp., PA 16066

Ronda J. Winnecour, Esq.
Suite 3250, USX Tower
600 Grant Street
Pittsburgh, PA 15219

Office of the United States Trustee
Liberty Center
1001 Liberty Avenue, Suite 970
Pittsburgh, PA 15222

Dated: January 31, 2023

*/s/ Ben Hutman*
By:  Ben Hutman (admitted pro hac vice in Main Case, and application for pro hac vice admission pending for this adversary case)
Sadis & Goldberg, LLP
551 Fifth Avenue, 21st Floor
New York, New York 10176
Telephone:  (212) 947-3793
Email:  bhutman@sadis.com